IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SHRI NILKANTH, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| v. | ) Case 23 CV 3124 |
| | ) |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| SHRI NILKANTH, LLC; YASHVANT PATEL as | ) |
| Trustee, or the current Trustee of The | ) |
| Yashvant C. Patel Revocable Living | ) |
| Trust, Dated January 11, 2010; | ) |
| MINAKSHIBEN Y. PATEL, as Trustee, or | ) |
| the current Trustee of The | ) |
| Minakshiben Y. Patel Revocable Living | ) |
| Trust, Dated January 11, 2010; | ) |
| YASHVANT PATEL; KRISHNA ZALA, A/K/A/ | ) |
| KRISHNA PATEL; GOPI PATEL; GOPI PATEL | ) |
| As Trustee, or the current Trustee of | ) |
| The Yashvant Patel Irrevocable Trust, | ) |
| Dated January 11, 2010; MINAKSHIBEN | ) |
| PATEL, as Agent of the Yashvant Patel | ) |
| Irrevocable Trust, Dated January 11, | ) |
| 2010, AND NON-RECORD CLAIMANTS, | ) |
| | |
| Counter-defendants. | |

MEMORANDUM OPINION AND ORDER

This litigation originated as an action to quiet title to real property commonly known as 7601-23 South Kedzie Avenue in Chicago (the "Kedzie property"), which plaintiff Shri Nilkanth,

LLC filed in the Circuit Court of Cook County. The government removed the case to this court and filed counterclaims against Shri Nilkanth, LLC and various other entities as nominees for counter-defendant Yashvant Patel,[1] who in August of 2017 pled guilty to engaging in a fraudulent scheme as an officer of My Baps Construction Corporation, a company he exclusively owned and controlled. Yashvant was sentenced to six months in prison, and, as relevant here, ordered to pay restitution to the victims of his scheme—the individual employees and the union benefit funds—in an amount totaling $1,973,707. In 2017, the government recorded judgment liens against the Kedzie Property in effect until Yashvant's restitution liability is satisfied.[2]

In its counterclaims, the government alleges that Yashvant, as the beneficial owner of the Kedzie Property, violated the Illinois Uniform Fraudulent Transfer Act, 740 Ill. Comp. Stat. 160/5 ("IUFTA") by orchestrating a series of transfers among My

---

[1] For ease of exposition, I refer to the counter-defendants collectively as "Shri Nilkanth."

[2] In its motion, the government asserts without citation to evidence that "over $800,000" remains unpaid. I note that in the government's September 3, 2019, motion for turnover in Yashvant's criminal case, however, it asserted—and the court found—that only $597,515.68 remained outstanding as of that date. *United States v. Yashvant Patel*, No. 15 CR 478-1 at ECF 87 (turnover order), ¶ 1 and 68 (motion for turnover), ¶ 1. While the record before me does not explain this discrepancy (particularly since the sentencing judge waived interest on the restitution judgment), so long as Yashvant's restitution liability is undischarged—which no one disputes—the amount of his remaining obligation is immaterial for present purposes.

Baps and other entities that he and his family controlled. Now pending is the government's motion for partial summary judgment on its counterclaims for avoidance of fraudulent transfer, which I grant for the following reasons.

The IUFTA "protects against two kinds of fraudulent transfers: transfers with an actual intent to defraud and transfers which the law considers fraudulent (i.e., constructive fraud or fraud in law)." *Gen. Elec. Cap. Corp. v. Lease Resol. Corp.*, 128 F.3d 1074, 1078 (7th Cir. 1997). Although the government's terminology in its opening brief muddies the waters, its discussion makes clear that it seeks summary judgment on a theory of *constructive fraud*, which does not require fraudulent intent. Accordingly, the government must point to undisputed facts showing: 1) that Yashvant voluntarily transferred the Kedzie Property; 2) at a time he had incurred obligations elsewhere; 3) that Yashvant made the transfer without receiving reasonably equivalent value in exchange; and 4) that after the transfer, Yashvant failed to retain sufficient property to pay the indebtedness. *Id.* at 1079. The government asserts forty-six numbered factual statements—all but three of which are admitted—to establish these. Except where noted, the following account is drawn from those factual statements.

In 2007, My Baps began work pursuant to certain "Green Alley" contracts it had with the City of Chicago, which involved the

3

repaving of alleys in designated areas pursuant to the City's specifications. Those contracts required My Baps to hire union labor, report union hours, and contribute to union benefit funds on behalf of union workers. But from around January of 2009 through at least October of 2010, Yashvant—who controlled the management, daily operations, and finances of My Baps, and who authorized the payment of bills, employee wages, and contributions to the union funds—knowingly underpaid employees and provided fraudulent monthly reports and incorrect contribution checks to the funds.

During the same time period, My Baps was involved in a multi-million dollar payment dispute with the City for certain work it performed. Pursuant to dispute resolution procedures governing the relevant contracts, on November 4, 2009, Yashvant notified the Chicago Department of Transportation ("CDOT") that My Baps claimed payment for work that the City refused to compensate on the ground that it was outside the terms of My Baps's contracts.[3] On March 2, 2010, the CDOT's Deputy Commissioner denied My Baps's claim for payment. Gov't. L.R. 56.1 Stmt., Exh F, ECF 81-1 at 49-50. My Baps appealed, and the dispute was not finally resolved until 2017,

---

[3] The record does not reflect when My Baps expected to receive payment for the work in question, or when it first demanded payment, but the Illinois Appellate Court's decision describes several steps that precede notifying CDOT of a contractual dispute. Accordingly, it is reasonable to assume that the dispute began some time prior to November of 2009.

when the Appellate Court of Illinois held that My Baps was not entitled to the claimed payment.

Amidst this dispute, in or around July of 2009, Yashvant "decided to transfer the Kedzie Property"—which My Baps had purchased for $840,000 in 2006 and used for business purposes—"to Yashvant's adult daughters Gopi Patel and Krishna Patel as part of estate planning for his kids' future." Gov't. L.R. 56.1 Stmt., ECF 88 ¶ 15. To this end, on February 4, 2010, Yashvant caused My Baps to transfer a one-half interest in the Kedzie Property to each of two recently-formed trusts: the Yashvant C. Patel Revocable Living Trust, dated January 11, 2010, which names Yashvant as trustee, (the "Yashvant Revocable Trust"), and the Minakshiben Y. Patel Revocable Trust, dated January 11, 2010, which names Yashvant's wife, Minakshiben, as trustee (the "Mina Trust"). On March 14, 2010, Yashvant and Mina, as trustees of their respective revocable trusts, transferred the Kedzie Property to Shri Nilkanth, LLC, a limited liability company. Although the quitclaim deeds effectuating these transfers state that the Kedzie Property was exchanged for consideration of $10.00, all agree that no money actually changed hands, and that the Kedzie Property was gifted first to the trusts and then to Shri Nilkanth, LLC, for Gopi and Krishna's benefit, as part of the family's estate planning.

The record is a morass of conflicting evidence concerning Shri Nilkanth, LLC's membership. In their initial L.R. 56.1

5

statements, the parties agree that Gopi and Krishna formed the LLC in October of 2009, and that the sisters were its equal members until January 1, 2011, when they transferred their respective interests to the Yashvant C. Patel Irrevocable Trust, dated January 11, 2010 (the "Yashvant Irrevocable Trust"). Gov't. L.R. 56.1(a) Stmt., ECF ¶¶ 16, 27, 29. But Shri Nilkanth, LLC's Articles of Incorporation, which Krisha signed as the entity's registered agent and filed with the Illinois Secretary of State on October 9, 2009, name the Yashvant Irrevocable Trust as the entity's sole member.[4] Indeed, every annual report that Shri Nilkanth, LLC filed from 2009 to at least 2024 identifies the Yashvant Irrevocable Trust as the entity's sole member. *See* Gov't. L.R. 56.1(c)(2) Stmt., ECF 94 at ¶¶ 50, 51 and Exhs. AD, AE.

Nevertheless, when My Baps filed for bankruptcy in September of 2011, its Statement of Financial Affairs states that on March 14, 2010, My Baps transferred property to "Shri Nilanth (sic) LLC (*Owned by Stockholder's Daughters*) Real Estate transferred as part of Estate Plan," describing the real estate as "Commercial Property" for which My Baps received "$0.00." Gov't. L.R. 56.1 Stmt., ¶ 31 and Exh. Q. Meanwhile, a document captioned "General Power of Attorney," purports to grant Mina—as putative trustee of the Yashvant Irrevocable Trust—power of attorney to act as

---

[4] Perplexingly, this filing predates the January 11, 2010, formation of the Yashvant Irrevocable Trust.

"attorney in fact" for Shri Nilkanth, LLC in connection with My Baps's bankruptcy. ECF 81-2 at 8.[5] This document is dated February 12, 2012; yet it was not until April 27, 2012, that Gopi—the trustee named in the Yashvant Irrevocable Trust—granted Mina equal trustee powers. *See* Gov't. L.R. 56.1 Stmt. at ¶ 31, ECF 81 at 6, and Exh. X, ECF 81-3 at 146. Moreover, the document is signed by Krishna in her capacity as "Member" of Shri Nilkanth, LLC; yet as noted above, neither that entity's Articles of Incorporation nor any of its Annual Reports names Krishna as a Member, while Shri Nilkanth elsewhere contends that Krishna and Gopi had transferred their membership interests in the LLC to the Yashvant Irrevocable Trust as of January 1, 2011.

Whatever one makes of this dizzying parade of transfers among entities of fluid membership, ownership, and control, one thing is clear: no matter which entity held title to the Kedzie Property, or which individuals were authorized on behalf of those entities, Yashvant and his family treated the property as Yashvant's personal asset. Underscoring the point, no one argues that Yashvant transferred his *stock* in My Baps—i.e., his ownership interest in

---

[5] Introducing this document is a paper bearing the My Baps bankruptcy case caption, which is addressed "to whom it may concern" and which states: "the attorneys for the Trust and the LLC had erroneously included Krishna and Gopi Patel in the Articles of Organization as Members of the LLC." *Id*. As of that date, however, Gopi—not Mina—was the trustee of the Yashvant Irrevocable Trust.

the corporation, which Illinois law recognizes as personal property, *see, e.g.*, *In re Berman's Est.,* 187 N.E.2d 541, 544 (Ill. App. Ct. 1963)—for the benefit of his children. Instead, he caused My Baps to transfer the Kedzie Property itself—which Shri Nilkanth insists was a *corporate* asset—without even a pretense that doing so served any *corporate* interest.

To the contrary, Yashvant and his daughters all frankly acknowledged that the successive transfers of the Kedzie Property from My Baps to the trusts and from the trusts to Shri Nilkanth, LLC were designed to promote the family's personal interests.[6] In this way, Yashvant used My Baps and the various other entities as mere "conduit[s]" for his personal pursuits. Accordingly, I conclude that it is appropriate to pierce the corporate veil and consider Yashvant the beneficial owner of the Kedzie Property. *See*, e.g., *People ex rel. Scott v. Pintozzi*, 277 N.E.2d 844, 851 (Ill. 1971) (piercing corporate veil where there was "such unity of interest and ownership that the separateness of the individual and corporation has ceased to exist"); *Fontana v. TLD Builders, Inc.*, 840 N.E.2d 767, 775 (2005) (disregarding corporate entity where business acted as the "alter ego" or "conduit" for another person). *See also id.* at 782 ("[a]ctual fraud is not necessarily

---

[6] For instance, Gopi testified that the sole reason the Yashvant Irrevocable Trust was created was to "protect" the Kedzie Property in the event of a breakdown in Gopi's marriage. See Gopi Tr. at 30-31, ECF 81-1 at 72-72.

a predicate to piercing the corporate veil; limited liability may be discarded to prevent injustice or inequitable consequences.").

This conclusion is fatal to Shri Nilkanth's primary argument in opposition to summary judgment: that "Yashvan individually did not own and held no right, title, or interest in and to the Kedzie Property at any time." Opp., ECF 87 at 7. And its remaining arguments—most of which focus on elements of *actual* fraud, which are not at issue on the government's motion—warrant little discussion. For instance, Shri Nilkanth insists that evidence of Yashvant's estate planning purpose negates any inference of Yashvant's intent to defraud, and that certain "badges of fraud" are missing or contested. *See*, e.g., Opp., ECF 87 at 4 (arguing that evidence that "all the transfers were fashioned for estate planning purposes based on the recommendations of an accountant and estate planning attorneys, and not made with any intent to hinder, delay, or defraud any creditors named in the restitution order" is a "dispositive" reason to deny summary judgment), and 6 (listing "badges of fraud").[7] Shri Nilkanth gets no traction from these arguments.

---

[7] While immaterial to my analysis, I note nevertheless that several of the "badges of fraud" Shri Nilkanth identifies are undisputedly present, including that the transfers were to insiders and that My Baps became insolvent shortly after the transfer was made. *See* Opp. ECF 87 at 6.

Recall the essential elements of the government's claim: a voluntary transfer; obligations elsewhere; inadequate consideration; and failure to retain sufficient assets to satisfy those obligations. Shri Nilkanth's arguments address only the last two, and they fail to persuade. With respect to consideration, there is no dispute that no money changed hands in connection with any of the recorded transfers of the My Baps property. Faced with uncontroverted evidence on this point, Shri Nilkanth advances the convoluted theory that a promissory note Shri Nilkanth, LLC executed on June 18, 2010, encumbering the Kedzie Property was somehow consideration for the Yashvant and Mina Revocable Trust's transfer of the Kedzie Property to it *three months earlier*, and that Shri Nilkanth's indebtedness somehow caused My Baps' release, *two days earlier* from its mortgage obligations on the Kedzie Property. It is hard to make heads or tails of this argument; but whatever Shri Nilkanth's theory, the loans and obligations it describes do not controvert Yashvant and his daughters' unequivocal statements, supported by documents from My Baps's bankruptcy, that My Baps gifted the Kedzie Property in exchange for "$0.00." In any event, Shri Nilkanth offers no authority supporting the notion that indebtedness Shri Nilkanth, LLC incurred months after My Baps transferred the Kedzie Property and days after My Baps was released from its mortgage obligations can be deemed consideration for those transactions.

This leaves only the final element of the government's constructive fraud claim: whether My Baps retained sufficient assets after transferring the Kedzie Property to satisfy its debts. Shri Nilkanth argues that My Baps was solvent at the time it gifted the Kedzie Property to the Yashvant and Mina Revocable Trusts and remained solvent thereafter, pointing to various accounting documents from 2009 and 2010 purporting to show that My Baps had assets in excess of its liabilities and a positive profit-loss ratio during that period. But Shri Nilkanth offers no witness testimony interpreting these documents, and the government offers compelling reasons for not taking their "bottom lines" at face value. For one thing, the documents relate to the very period Yashvant admitted that My Baps was shorting its employees and their benefit funds, so at a minimum, the line item for "payroll liabilities" understates the company's true liability. For another, the records appear to include in "accounts payable" over $850,000 billed to the City under the disputed Green Alley contracts—accounts the records indicate were outstanding for over 120 days as of September 30, 2010.

But even if I ignore these issues, the government need not show that My Baps was actually insolvent to prevail on its fraudulent transfer claims. *Falcon v. Thomas*, 629 N.E.2d 789, 796 (Ill. App. Ct. 1994) ("Actual insolvency is not required. The test is whether the conveyance directly tended to or did impair the

11

rights of creditors."). Indeed, "[i]t is of no moment that the property remaining in the grantor's hands after the conveyance was in nominal value more than equal to the amount of his indebtedness if subsequent events show that the property retained was not sufficient to discharge all his liabilities." *PNC Bank, Nat'l Ass'n v. Knezevic*, No. 20 C 6099, 2023 WL 10992296, at *14 (N.D. Ill. Mar. 31, 2023) (quoting *Cairo Lumber Co.* v. *Ladenberger*, 39 N.E.2d 596, 598 (Ill. App. Ct. 1941)). Here, subsequent events unmistakably revealed My Baps's inability to satisfy its obligations at the time it transferred the Kedzie Property.

For the foregoing reasons, I conclude that undisputed evidence establishes the government's claim of constructive fraud under the IUFTA. Its motion for summary judgment is granted.

**ENTER ORDER:**

**Elaine E. Bucklo**
United States District Judge

Dated: March 23, 2026